IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| FRANK R. CURKOV, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 25-cv-XXXXX |
| | ) | |
| BORDER STATES INDUSTRIES, INC., | ) | |
| and AARON HUGHES, individually, | ) | |
| | ) | |
| Defendants. | ) | |

## COMPLAINT

Plaintiff, FRANK R. CURKOV, by and through his attorneys, THE COFFEY LAW OFFICE, P.C., and in support of his Complaint against Defendants BORDER STATES INDUSTRIES, INC., and AARON HUGHES, states as follows:

**Nature of Case**

1.      Plaintiff brings this action against Defendants to recover damages proximately caused by Defendants' failure to pay him in full his earned wages and final compensation and retaliation including retaliatory discharge in violation of the Illinois Wage Payment and Collection Act, 820 ILCS § 115/1 *et seq.* (the "IWPCA"), and additionally against Defendant Border States Industries, Inc., for its discrimination and retaliation including the termination of his employment in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e et seq. (hereafter "Title VII"), the Age Discrimination in Employment Act of 1967, as amended, 29 U.S.C. § 621 et seq. (the "ADEA"), and the clearly mandated public policy of the State of Illinois ("CMPPI").

**Jurisdiction and Venue**

2.      This Court has original subject matter jurisdiction over Plaintiff's Title VII

1

and ADEA claims under 28 U.S.C. §§ 1331, 1337, 1343, and 29 U.S.C § 216(b). This action is authorized and instituted pursuant to Sections 703(a)(1) and 703 (k)(1)(A) of Title VII.

3. This Court has supplemental jurisdiction over Plaintiff's IWPCA and CMPPI claims pursuant to 28 U.S.C. 1367(a).

4. Venue is proper in this Court pursuant to 28 U.S.C. § 1391 in that Plaintiff is a resident of this District, and Defendants' illegal acts complained of herein took place within the geographical boundaries of this Court's jurisdiction.

5. On June 18, 2024, Plaintiff filed a timely charge of illegal discrimination and retaliation against Defendant Border States Industries, Inc., in violation of Title VII and the ADEA with the local district office of the EEOC.

6. On December 3, 2024, the EEOC issued its Notice of Right to Sue, a copy of which is attached hereto. This Complaint is being filed within 90 days of Plaintiff's receipt of the EEOC Right to Sue Notice.

**The Parties**

7. Plaintiff, Frank R. Curkov ("Frank"), is a 62 year old individual residing at all relevant times in Cook County, Illinois.

8. Defendant, Border States Industries, Inc. (hereafter the "BSI"), is a foreign corporation registered and licensed to do business in Illinois, and at all times relevant to the allegations herein, operated a business in Chicago, Illinois (and surrounding suburbs) where illegal activities described below took place.

9. BSI employs in excess of 15 workers and is therefore an "employer" within the meaning of the Title VII and the ADEA.

10.     Defendant Aaron Hughes is an individual residing on information and belief in Cook County, Illinois. At all times relevant to this Complaint, Defendant Hughes was BSI's Area Director as well as an owner of BSI.

**Facts Common to all Counts**

11.     Frank began his employment with a predecessor of BSI in August 1999 in the position of outside sales.

12.     Frank's job performance at all times met or exceeded BSI's legitimate expectations. He was consistently the top, or among the top salespersons at BSI.

13.     In or around late 2018/early 2019, Michael Maloney (approx. 35 years old) became Sales Manager and Frank's direct supervisor.

14.     In or around May 2022, BSI purchased and/or merged with Frank's initial employer and he became an employee of BSI.

### *Defendants Fail to Fully Compensate Frank for Commissions Earned*

15.     Effective April 2016 and through to BSI's November 2023 termination of Frank's employment, BSI (and its predecessor before it) maintained an "Outside Sales Commission Policy" ("BSI's Commission Policy") that it applied to sales made by outside salespersons such as Frank.

16.     BSI's Commissions Policy included the following terms relevant here:

-   commissions will be paid at a rate of 14% of gross profit on paid invoices; the commission rate will increase to 15% if the outside salesperson hits 100% of their annual sales budget; if the outside salesperson achieves 110% of budget or greater, the commission rate will increase to 16%; the additional commission will be paid out with the final commissions check;

- commissions will be calculated and paid on a quarterly basis by taking the total commission earned (gross profit earned X commission rate), minus deductions, and subtract the gross payroll earned through that quarter; and,

- costs incurred in servicing the order will be deducted from gross profit earned, i.e., freight.

17. Due to Frank's seniority, experience, and success, Defendants agreed to pay Frank and did pay Frank commissions at a rate of 15% of gross profit on paid invoices.

18. During period 2020 to 2023, Frank was responsible for a selling a large datacenter project to Facebook through a contractor. This project included cable bus, fixtures, and other electrical equipment and resulted in BSI paying Frank several commission checks including a significant commissions check in April 2023.

19. Contrary to past practice and the BSI Commissions Policy, however, BSI deducted a little over $800,000 in alleged labor, truck, and equipment costs from gross profit in calculating commissions due to Frank.

20. Some of the "labor" costs that BSI deducted were described simply as a salaried employee's name multiplied by an unsupported number of hours over a three-year period such persons allegedly worked on the Facebook project. For instance, deductions included charges for time that Frank's sales manager, salaried employee Michael Maloney, allegedly spent working on the project.

21. Salaries to Maloney and other are fixed costs that BSI was obligated to pay regardless of how much or little time they spent working on the Facebook project or any other sales project or job duty.

22.     On information and belief, BSI had never before applied Maloney's salary or any other employee's salary to reduce a salesperson's commissions under the BSI Commission Policy.

23.     On information and belief, BSI had never before applied any employee's salary to reduce a salesperson's commissions under the BSI Commission Policy.

24.     BSI also failed to include in in Frank's commissions payment approximately $300,000 of services sold and approximately $150,000 for an extended warranty sold related to the project.

25.     These errors combined to understate BSI's April 2023 commissions payment to Frank related to the FB project by approximately $189,500.

26.     Frank notified BSI and Defendant Hughes of the shortage in April 2023 and requested payment in full several times including in a September 2023 email to Hughes explaining that in the years since the BSI Commissions Policy was implemented, Frank's commissions were never reduced due to similar alleged costs and that he was not aware of any salespersons' commissions being so reduced.

27.     On November 7, 2023, Hughes replied via email wherein he acknowledged that the cost deductions applied to reduce Frank's commissions check had not been made in the past with respect to any of Frank's or any other salespersons' sales/commissions.

28.     Hughes also acknowledged that the charge for labor applied to reduce Frank's commission payment was in fact overstated by $273,375, and Frank was therefore due an additional $41,006 in commissions.

5

29. Last, Hughes stated that Frank would have to sign a release of claims regarding his first quarter bonus payment in order to receive the additional $41,006 in commissions.

30. Further, on information and belief, BSI had invoiced an additional $750,000 to $900,000 that remained due and owing related to the Facebook project at the time it terminated Frank's employment in November 2023.

31. Prior to BSI's termination of his employment, Frank had procured sales with several other customers/contractors including a significant sale to end user McCormick Place.

32. On information and belief, BSI received additional revenues and monies related to the Facebook project and Frank's other sales after it terminated Frank's employment.

33. Under the BSI Commissions Policy, Frank has a right to commissions that BSI received after it terminated his employment that were related to these sales.

34. In addition to commissions that Defendants owe Frank related to the Facebook project, they also owe Frank commissions on his sales to customer Jasco. As memorialized in May 18, 2023 emails between Frank and Defendant Hughes, in the 2020-2021 time frame, Frank and Defendant Hughes agreed that Frank would be paid commissions on Jasco sales at 12% commission rate for slow pay. BSI, however, only paid Frank at 8-9% related to Jasco sales, not the agreed to 12%.

### BSI's Age and Gender Discrimination Against Frank

35. BSI, primarily through substantially younger Sales Manager Maloney with the acquiescence of Defendant Hughes, subjected Frank to disparate and less

favorable terms and conditions of employment vis-a-vis his female and/or substantially younger peers including, but not limited to, holding Frank to unrealistically high sales budgets/goals (millions higher than his closest peer), changing the agreed to terms of Frank's commission payments related to my sales after the fact (as described above), increasing Frank's sales budget without business reason, denying Frank payment of his earned bonus, and subjecting Frank to hyper scrutiny including false and/or disparate criticism including a PIP.

36.     In or around May 2022, Frank complained about the discriminatory treatment to BSI including to Defendant Hughes after a lunch meeting with a customer at Gibsons.

37.     Frank thereafter continued to complain to BSI at various times through to BSI's November 2023 termination of his employment

38.     In March 2023, BSI hired Cristina Camposano, a substantially younger (approximately 35 years old), female for a project manager position. Frank thereafter worked with Camposano in connection with several sales/potential customers/jobs.

39.     In or around September 2021, Defendant Hughes asked Frank to interview Camposano for a project manager position at with BSI predecessor, Advanced Electrical.

40.     Prior to interviewing Camposano, Frank was informed by Operations Manager Michelle Pecak that she had information that Camposano had anger and behavioral issues at her prior job that may have factored into the termination of that job.

41.     At the interview, Frank asked Camposano whether she had any anger or behavioral issues at her prior job. Camposano became emotional and stated to Frank

7

that she was working on her issues and seeing a counselor.

42. Frank relayed this information to Hughes.

43. Advanced did not hire Camposano at that time.

44. Michelle Pecak informed Frank that after reviewing Camposano's application and speaking with her, the company determined that she did not fit its culture.

45. On two occasions in 2023, the second one occurring in late October 2023, Camposano's behavior while with Frank and at customers' places of business was inappropriate including not listening, speaking aggressively and loudly, and using profanity (some directed at Frank).

46. Frank asked Camposano to stop and attempted to coach her and use the instances as learning experiences.

47. After the second incident, BSI notified Frank that Camposano allegedly complained about him.

48. BSI did not inform Frank that Camposano alleged that Frank made any sexist statements or remarks to her.

49. In or around February 2023, Frank talked with Defendant Hughes and explained the initial Camposano incident and informed him that he had learned Camposano had been fired from her previous job due to similar inappropriate behavior.

50. Defendant Hughes told Frank that he was aware Camposano was terminated from her prior job due to similar inappropriate behavior, but that he had decided to believe her with respect to her complaint about Frank. He gave no explanation.

8

51. On November 16, 2023, BSI terminated Frank's employment for the false and pretextual stated reason that there had been no improvement in his performance since a PIP was issued in twelve months earlier in November 2022.

52. BSI provided no follow up regarding the PIP after it was issued in November 2022.

53. In May 2023, Frank received a generally positive verbal performance review.

54. Again, BSI did not inform Frank that Camposano alleged that Frank made a sexist remark to her or that this was a reason that it decided to terminate his employment.

55. Following BSI's termination of his employment, Frank requested and received a copy of his personnel file from BSI per the Illinois Personnel Record Review Act, 820 ILCS 40/0/01 et seq.

56. BSI's file included several fabricated and fraudulent documents including an alleged February 2022 "Corrective Action Notice" that Frank had ever seen before and had not received notice of. The document has no signatures - the employee, manager/supervisor, and HR signature lines are all blank.

57. The file sent by BSI also included an alleged "FY2023 Performance Review" that Frank had never seen before and set forth false, discriminatory allegations by Frank's former manager Mike Maloney.

58. The file BSI sent also included an alleged December 2022 memo regarding PIP follow up with alleged additional examples that Frank had never received during his employment.

59. Last, it was not until October 2024, nearly a year after the termination and in connection with Frank's EEOC charge of discrimination and retaliation that BSI first alleged that Camposano claimed Frank made a sexist statement to her and that such allegation was a reason it terminated Frank's employment.

60. In addition to other evidence of Defendants' discriminatory and retaliatory treatment of Frank, these false and fraudulent documents and newly created/shifting alleged reasons for ending Frank's employment show Defendants' discriminatory and retaliatory animus towards Frank and pretext with respect to its alleged reason for terminating his employment.

**Count I: Failure to Pay Earned Wages and Final Compensation
in Violation of the IWPCA
(v. Both Defendants)**

61. Frank realleges and fully incorporates into Count I the allegations of paragraphs 1 through 60, above.

62. BSI at all times relevant to this action was an "employer" as defined at Section 115(2) of the IWPCA (820 ILCS § 115/2).

63. At all relevant times, Defendant Aaron Hughes acted directly in the interest of, and on behalf of BSI in relation to Frank, and knowingly permitted BSI to violate the provisions of the IWPCA. Hughes is also the person who refused to fully pay Frank for his earned commissions and terminated and/or participated in the termination of Frank's BSI employment all as described above.

64. Defendant Aaron Hughes at all times relevant to this action was therefore an "employer" as defined at Sections 115/2 and 115/13 of the IWPCA (820 ILCS §§ 115/2 and 115/13).

65.     Frank was at all times relevant to this action was an "employee" of Defendants BSI and Hughes as defined at Section 115(2) of the IWPCA (820 ILCS § 115/2).

66.     The IWPCA requires that employers pay employees all wages including commissions and bonuses that they earn during a weekly pay period no later than 7 days after the end of the weekly pay period in which the wages were earned, and all wages earned during the semi-monthly or bi-weekly pay period no later than 13 days after the end of the pay period in which such wages were earned. See 820 ILCS §§ 115/3 and 4.

67.     The IWPCA also requires that employers pay employees their "final compensation," including earned commissions and bonuses, at the time the employee separates, or no later than the next regularly scheduled payday. See 820 ILCS §115/5.

68.     Under the IWPCA, an employee not timely paid wages, final compensation, or wage supplements by his or her employer as required by this Act shall be entitled to recover through a civil action the amount of any such underpayments and damages of 5% of the amount of any such underpayments for each month following the date of payment during which such underpayments remain unpaid. In a civil action, such employee shall also recover costs and all reasonable attorney's fees. See 820 ILCS §115/14(a).

69.     Additionally, under the IWPCA, an employer or any agent of an employer, who, being able to pay wages, final compensation, or wage supplements and being under a duty to pay, willfully refuses to pay as provided in the IWPCA, or falsely denies the amount or validity thereof or that the same is due, with intent to secure for himself or

other person any underpayment of such indebtedness or with intent to annoy, harass, oppress, hinder, delay or defraud the person to whom such indebtedness is due, upon conviction, is guilty of a Class A misdemeanor for unpaid wages, final compensation, or wage supplements in the amount of more than $5,000, and each day during which any violation of the IWPCA continues shall constitute a separate and distinct offense. See 820 ILCS §115/14(a).

70.     As of BSI's November 2023 termination of his employment and based on the parties' agreements including the BSI Commission Policy, Frank's work, effort, and sales, and related BSI revenue and gross profit that Frank procured for BSI all as described above, Frank had done all things necessary and required of him to "earn," as that term is defined under the IWPCA, commissions as described above.

71.     As also described above, Defendants' failed to fully pay Frank his earned commissions in violation of the IWPCA.

72.     At all relevant times, Defendants were able to pay Frank fully for his earned commissions.

73.     Defendants knew that their failure to fully pay Frank his earned commissions was prohibited by the IWPCA, or acted with reckless disregard to that possibility.

### Count II: Retaliatory Discharge in Violation of the IWPCA
### (v. Both Defendants)

74.     Frank realleges and fully incorporates into Count II the allegations of paragraphs 1 through 73, above.

75.     Under the IWPCA, an employer, or any agent of an employer, who discharges or in any other manner discriminates against any employee because that

employee has made a complaint to his or her employer that he or she has not been paid in accordance with the provisions of this Act is guilty, upon conviction, of a Class C misdemeanor. See 820 ILCS § 115/14(c).

76.     Additionally, under the IWPCA, an employee who has been unlawfully retaliated against shall be entitled to recover through a civil action all legal and equitable relief as may be appropriate. In a civil action, such employee shall also recover costs and all reasonable attorney's fees. See 820 ILCS § 115/14(c).

77.     As described above, Frank's complaints to Defendants including his September 19, 2023 email demanding that he be paid full commissions on the Facebook project per BSI's Commissions Policy is legally protected activity under the IWPCA.

78.     Defendants were fully aware of Frank's IWPCA protected activity.

79.     As described above, Defendants retaliated against Frank because of his IWPCA protected activity including but not limited to terminating his employment.

80.     On information and belief, and as described above, Defendants have treated similarly situated employees who did not engage in legally protected activity including, but not limited to, Christina Camposano more favorably and not terminated their employment after they were alleged to have engaged in as serious or more serious acts of misconduct.

81.     On information and belief, BSI assigned to some or all of Frank's former job duties and accounts/customers to one or more employees who did not engage in legally protected activity.

82.     As a direct and proximate result of Defendants' illegal retaliation against Frank as described above, he has lost, and is expected to continue to lose, income in the form of wages and employment benefits, social security and other benefits in a sum to be proven at trial, and has suffered emotional pain, mental anguish, loss of enjoyment of life, and other non-pecuniary losses.

83.     Defendants knew that their retaliation against Frank including their retaliatory termination of Frank's employment was prohibited by the IWPCA, or acted with reckless disregard to that possibility.

### Count III: Retaliatory Discharge in Violation of CMPPI
### (v. Defendant BSI)

84.     Frank realleges and fully incorporates into Count III the allegations of paragraphs 1 through 83, above.

85.     The common law and clearly mandated public policy of Illinois protect employees who report what they reasonably believe to be crimes from being discharged from their jobs because of such reports.

86.     The common law and clearly mandated public policy of Illinois also protects employees who complain about or report what they reasonably believe to be wage theft or not being fully and completely paid for services rendered from being discharged from their jobs because of such complaints or reports.

87.     Additionally, under the IWPCA, it is a crime for any employer, or any agent of an employer, to fail to pay an employee earned wages when it is able to do so, and to discharge or in any other manner discriminate against any employee because that employee has made a complaint to his or her employer that he or she has not been paid in accordance with the provisions of this Act. See 820 ILCS § 115/14(a) and (c).

14

88.     As described above, in 2023 through to BSI's November 2023 termination of his employment, Frank in good faith reported and protested what he reasonably believed to be a crime (i.e., Defendants underpayment of his earned commissions) to Defendants.

89.     Such activities are protected by the CMPPI as embodied in statutes and regulations including, but not limited to, the IWPCA.

90.     BSI was fully aware of Frank's IWPCA protected activity.

91.     As described above, BSI terminated Frank's employment because of his CMPPI protected activity.

92.     On information and belief, and as described above, BSI has treated similarly situated employees who did not engage in legally protected activity including, but not limited to, Christina Camposano more favorably and not terminated their employment after they were alleged to have engaged in as serious or more serious acts of misconduct.

93.     On information and belief, BSI assigned to some or all of Frank's former job duties and accounts/customers to one or more employees who did not engage in legally protected activity.

94.     As a direct and proximate result of BSI illegal retaliatory discharge of Frank's employment as described above, he has lost, and is expected to continue to lose, income in the form of wages and employment benefits, social security and other benefits in a sum to be proven at trial, and has suffered emotional pain, mental anguish, loss of enjoyment of life, and other non-pecuniary losses.

95.     BSI knew that its retaliatory termination of Frank's employment was prohibited by the CMPPI, or acted with reckless disregard to that possibility.

### Count IV: Gender Discrimination in Violation of Title VII
### (v. Defendant BSI)

96.     Frank restates and fully incorporates into Count IV his allegations set forth in Paragraphs 1 through 60, above.

97.     Title VII makes it illegal for an employer such as BSI to discriminate against an employee such as Frank with respect to his compensation, terms, conditions, or privileges of employment, including terminating his employment because of his gender.

98.     BSI took the above-described acts and omissions against Frank including but not limited to terminating his employment because of his gender in violation of Title VII.

99.     On information and belief, and as described above, BSI has treated similarly situated, female employees including, but not limited to, Christina Camposano more favorably and not terminated their employment after they were alleged to have engaged in as serious or more serious acts of misconduct.

100.    On information and belief, BSI assigned to some or all of Frank's former job duties and accounts/customers to one or more female employees.

101.    As a direct and proximate result of BSI's illegal gender discrimination against Frank as described above, he has lost, and is expected to continue to lose, income in the form of wages and prospective retirement benefits, social security and other benefits in a sum to be proven at trial, and has suffered emotional pain, mental anguish, loss of enjoyment of life, and other non-pecuniary losses.

16

102. BSI knew that its discriminatory acts as described above were prohibited by Title VII, or acted with reckless disregard to that possibility.

### Count V: Retaliation in Violation of Title VII
### (v. Defendant BSI)

103. Frank restates and fully incorporates into Count V his allegations set forth in Paragraphs 1 through 60, above.

104. Title VII makes it unlawful for an employer "to discriminate against any individual . . . because he has opposed any practice made an unlawful employment practice by [Title VII], or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII]." 42 U.S.C. § 2000e-3(a).

105. As described above, beginning in May 2022 and continuing through to BSI's November 2023 termination of his employment, Frank made numerous internal complaints alleging in good faith that he was subjected to different terms and conditions of employment because of his gender and thereby engaged in protected activity under Title VII.

106. BSI took the above-described acts and omissions against Frank including but not limited to terminating his employment because of his Title VII protected activity.

107. On information and belief, and as described above, BSI has treated similarly situated employees who did not engage in legally protected activity including, but not limited to, Christina Camposano more favorably and not terminated their employment after they were alleged to have engaged in as serious or more serious acts of misconduct.

17

108.    On information and belief, BSI assigned to some or all of Frank's former job duties and accounts/customers to one or more employees who did not engage in legally protected activity.

109.    As a direct and proximate result of BSI's illegal retaliation against Frank as described above, he has lost, and is expected to continue to lose, income in the form of wages and prospective retirement benefits, social security and other benefits in a sum to be proven at trial, and has suffered emotional pain, mental anguish, loss of enjoyment of life, and other non-pecuniary losses.

110.    BSI knew that its discriminatory acts as described above were prohibited by Title VII, or acted with reckless disregard to that possibility.

### Count VI: Age Discrimination in Violation of the ADEA
### (v. Defendant BSI)

111.    Frank restates and fully incorporates into Count VI his allegations set forth in Paragraphs 1 through 60, above.

112.    The ADEA makes it illegal for an employer such as BSI to discriminate against any individual over 40 years old with respect to his compensation, terms, conditions, or privileges of employment, including the termination of his employment, because of such individual's age. See 29 U.S.C. § 623(a).

113.    BSI took the above-described acts and omissions against Frank including but not limited to terminating his employment because of his age in violation of the ADEA.

114.    On information and belief, and as described above, BSI has treated similarly situated, substantially younger employees including, but not limited to, Christina Camposano more favorably and not terminated their employment after they

18

were alleged to have engaged in as serious or more serious acts of misconduct.

115. On information and belief, BSI assigned to some or all of Frank's former job duties and accounts/customers to one or more substantially younger employees.

116. As a direct and proximate result of BSI's illegal age discrimination against Frank as described above, he has lost, and is expected to continue to lose, income in the form of wages and prospective retirement benefits, social security and other benefits in a sum to be proven at trial, and has suffered emotional pain, mental anguish, loss of enjoyment of life, and other non-pecuniary losses.

117. BSI knew that its discriminatory acts as described above were prohibited by the ADEA, or acted with reckless disregard to that possibility.

### Count VII: Retaliation in Violation of the ADEA
### (v. Defendant BSI)

118. Frank restates and fully incorporates into Count VII his allegations set forth in Paragraphs 1 through 60, above.

119. The ADEA makes it unlawful for an employer to retaliate against an employee for opposing the employer's discriminatory practices or participating in any investigation or proceeding under the ADEA. See 29 U.S.C. § 623(d).

120. As described above, beginning in May 2022 and continuing through to BSI's November 2023 termination of his employment, Frank made numerous internal complaints alleging in good faith that he was subjected to different terms and conditions of employment because of his age and thereby engaged in protected activity under the ADEA.

121. BSI took the above-described acts and omissions against Frank including but not limited to terminating his employment because of his ADEA protected activity.

19

122. On information and belief, and as described above, BSI has treated similarly situated employees who did not engage in legally protected activity including, but not limited to, Christina Camposano more favorably and not terminated their employment after they were alleged to have engaged in as serious or more serious acts of misconduct.

123. On information and belief, BSI assigned to some or all of Frank's former job duties and accounts/customers to one or more employees who did not engage in legally protected activity.

124. As a direct and proximate result of BSI's illegal retaliation against Frank as described above, he has lost, and is expected to continue to lose, income in the form of wages and prospective retirement benefits, social security and other benefits in a sum to be proven at trial, and has suffered emotional pain, mental anguish, loss of enjoyment of life, and other non-pecuniary losses.

125. BSI knew that its discriminatory acts as described above were prohibited by the ADEA, or acted with reckless disregard to that possibility.

### Prayer for Relief (as to all Counts)

WHEREFORE, Plaintiff, FRANK R. CURKOV, respectfully requests that this Court enter judgment in his favor and against Defendants jointly and severally against Defendants BORDER STATES INDUSTRIES, INC., and AARON HUGHES as to Counts I and II, and against Defendant BORDER STATES INDUSTRIES, INC., as to Counts III-VII, as follows:

A. Order Defendants to make Frank whole by paying him appropriate back pay and reimbursement for benefits including lost retirement/401k benefits, social security and other benefits and out-of-pocket expenses, plus pre-judgment interest in an amount to be shown at trial;

20

B.      (Count VI and VII) Order Defendant BSI to pay Frank an equal amount to A., above, and for liquidated damages under the ADEA;

C.      (Count I and II) Order Defendants to pay Frank an amount equivalent to his earned but unpaid commissions and bonuses and a five-percent (5%) penalty pursuant to 820 ILCS § 115/14(a);

C.      Order Defendant BSI to immediately reinstate Frank to his former position or one comparable thereto; or, in the alternative, order BSI to pay Frank an appropriate amount of front pay;

D.      Order Defendants to pay Frank compensatory damages in the maximum amount allowable under the law;

E.      Order Defendants to pay Frank punitive damages in the maximum amount allowable under the law.

F.      Order Defendants to pay Frank's costs incurred in bringing this action, including, but not limited to, expert witness fees and reasonable attorneys' fees;

G.      Try all issues of fact to a jury; and,

H.      Grant such other relief as the Court deems just.

Respectfully submitted,
Plaintiff, FRANK R. CURKOV,


By:      _____/s/ Timothy J. Coffey_____
Timothy J. Coffey, Esq.
THE COFFEY LAW OFFICE, P.C.
Attorneys for FRNAK R. CURKOV
118 N, Clinton Street, Suite 125
Chicago, IL   60661
(312) 627-9700
tcoffey@worker-law.com

21